1

2

3

4

5

6

7

8                IN THE UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10   BILLY PAUL BIRDWELL, II,

11           Plaintiff,              No. CIV S-10-0719 KJM GGH P

12       vs.

13   M. CATES, et al.,               ORDER &

14           Defendants.             FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17           Plaintiff is state prisoner proceeding pro se with a civil rights action pursuant to

18   42 U.S.C. § 1983.  Plaintiff alleges that the approximately seventeen served defendants infringed

19   on his ability to practice his religion, Asatru-Odinism, at Mule Creek State Prison (MCSP).  In

20   part, plaintiff was denied access to funds, classroom time, a spiritual advisor, the ability to

21   purchase religious goods, outdoor night worship, and Native American religions were provided a

22   larger outdoor space and the ability to have a fire pit.  Plaintiff raises Religious Land Use and

23   Institutionalized Persons Act (RLUIPA) claims, First Amendment Free Exercise claims,

24   Fourteenth Amendment Equal Protection claims and retaliation claims.  Plaintiff seeks injunctive

25   and monetary relief.  Presently pending are defendants' motions for summary judgment.  Docs.

26   77, 81.

1

II.  Motion for Summary Judgment

               Legal Standard for Summary Judgment

        Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

        Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

        If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of

specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

1 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

2         On February 9, 2011, the court advised plaintiff of the requirements for opposing

3 a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

4 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir.

5 1988).

6         The above advice would, however, seem to be unnecessary as the Ninth Circuit

7 has held that procedural requirements applied to ordinary litigants at summary judgment do not

8 apply to prisoner pro se litigants.  In Thomas v. Ponder, 611 F.3d 1144 (9th Cir. 2010), the

9 district courts were cautioned to "construe liberally motion papers and pleadings filed by *pro se*

10 inmates and ... avoid applying summary judgment rules strictly."  Id. at 1150.  No example or

11 further definition of "liberal" construction or "too strict" application of rules was given in Ponder

12 suggesting that any jurist would know inherently when to dispense with the wording of rules.

13 Since the application of any rule which results in adverse consequences to the pro se inmate

14 could always be construed in hindsight as not liberal enough a construction, or too strict an

15 application, it appears that only the essentials of summary judgment, i.e., declarations or

16 testimony under oath, and presentation of evidence not grossly at odds with rules of evidence,

17 need be submitted by the pro se party.[1]

18         Undisputed Facts

19         The following of defendants' undisputed facts (DUF) are either not disputed by

20 plaintiff, or following the court's review of the evidence submitted, have been deemed

21 undisputed:

22 \\\\\

23

---

24     [1] Defendants have provided 21 pages of undisputed facts.  Plaintiff has not responded to most of defendants undisputed facts and has instead included 5 pages of his undisputed facts.

25 While comparing the respective page counts is not determinative, plaintiff has named seventeen defendants and alleged violations of nearly every aspect of his religious life, making the undersigned's job all the more difficult in reviewing plaintiff's 324 page opposition to summary

26 judgment.

1    At the relevant time plaintiff was housed at Mule Creek State Prison (MCSP),

2  Facility C, on a Sensitive Needs Yards with inmates of different races and ethnic groups.  DUF

3  #4.  Many of these inmates had dropped out of prison gangs or disruptive groups.  Id.  On

4  January 18, 2011, plaintiff was transferred to a different institution.  Id.  Plaintiff has numerous

5  tattoos on his body including swastikas, a Thor's Hammer, the words "Aryan Loyalty" and

6  "White Power."  DUF #3.  Plaintiff denies current association with the Aryan Brotherhood prison

7  gang or White supremacist or skinhead groups.  DUF #2.

8    Plaintiff practices Odinism which is a modern version of the pagan polythesitic

9  religions of pre-Christian Northwestern Europe.  DUF #6.  Members at MCSP are White and

10  while plaintiff states that members of other races can be Odinists, the group at MCSP had no

11  African-American members, no Asians, one member who was half-White and half Hispanic, and

12  one who was half-White and half-Native American.  DUF #10, 50.  Plaintiff is of the Folkish

13  sect.  DUF #7.  Folkish Odinists believe that they carry the blood of Odin himself and his DNA,

14  and follow the strict code of their ancestral heritage.  DUF #8.  Plaintiff's ancestors were Saxon

15  and Scottish.  Id.  Odinists organize themselves into kindreds, also called hearths, which are

16  congregation or group of followers of the religion.  DUF #9.  Plaintiff's religious practice needs

17  are set forth in a book entitled Our Sacred Land.  DUF #11.  Odinists worship various Gods and

18  Goddesses, "ancestral" and land spirits and believe in a Father (Odin) who is Creator.  DUF #12.

19  22.  Odinists celebrate twelve ceremonies known as blots.  DUF #14.  Different Odinist kindreds

20  may have different blot rituals.  Id.

21    When plaintiff was at MCSP, Facility C, his kindred was the Blod

22  Tru Hearth and Clan Magni, which was a combination of two kindreds that had come together

23  and followed the blot structure of the "Odinic Rite."  DUF #22.  There were about eight inmates

24  in that kindred at the time plaintiff left MCSP, but at times there were as many as 18 members.

25  Id.  Plaintiff's hearth initially congregated with the Munin kindred, but separated from

26  them because of a difference in values.  DUF #23.

1       The outdoor worship area described in Our Sacred Land that plaintiff wants the

2   prison to provide includes: (1) a Circle of Mystery, 26 feet in diameter with a rise of eight inches

3   in the middle, requiring five and 3/4 tons of compacted dirt; (2) a one-and -a -half foot wide path

4   around the Circle of Mystery, requiring removal of sod and replacement with two tons of gravel;

5   (3) a fire pit, three feet in diameter and a foot and a half deep, circled with six- to eight inch

6   stones and 200 pounds of stone to line the interior wall of the fire pit; (4) a two-by-four foot

7   concrete or oak altar; (5) a thirteen-by-four foot Long Ship of Ancestral Way, with a four-foot

8   mast, broken and burned at the top, which is circled with stones and burnt embers, located 10 feet

9   from the Circle of Mystery; (6) a ritual tool storage box; (7) a storage box for firewood; (8) a

10   split-rail fence with hooks to hang warrior shields; (9) four six-by-four foot banner poles

11   anchored in the ground; (10) and a water source.  DUF #24.

12       MCSP allowed inmates to practice Odinism.  DUF #25.  The MCSP policies on

13   and practices on religious programs includes Odinism and was set forth in the Departmental

14   Operations Manual Supplement.  DUF #26.  A Religious Review Committee (RRC) reviewed

15   complex religious issues, recommended modification of local policies, and considered inmate

16   requests for religious accommodations.  DUF #28.  The RCC was comprised of Chaplains, the

17   Community Partnership Manager, Receiving & Release Sergeant, Food Services Manager,

18   Associate Warden for Central Services, or their designees, and other staff as necessary.  Id.

19   RCC recommendations were subject to review by the Warden who had final power to approve or

20   disapprove, and complex issues could be submitted to the Statewide Warden's Advisory

21   Committee (WAG) for resolution.  Id.

22       Plaintiff was allowed to have the following personal property: (1) Thor's Hammer

23   medallion and chain; (2) rune cards with instruction book; (3) Hlath, a solid colored headband

24   containing one or more runes, which could be worn at group services only; (4) Poetic Edda; and

25   (5) Prose Edda.  DUF #30.  Personal mead horns were not allowed.  Id.  Plaintiff had a Thor's

26   Hammer medallion, purchased from World Tree, one of the approved religious vendors; a set of

1  runes made of elk horn; and a Prose and Poetic Edda.  DUF #31.  Plaintiff did not state that he

2  needed a hlath, but he has a "bind rune" made from elk horn on a red leather thong.  Id.

3         For group worship at Mule Creek State Prison, plaintiff and other Odinists

4  inmates were allowed access to the following items: (1) an oath ring, up to six inches in diameter

5  used for sacred oaths; (2) rune cards; (3) altar candles; (4) a gandr, wooden staff one-half inch

6  thick to two feet long, representing the spear of Odin; and (5) a Thor's Hammer, 10-by-12 inch

7  wood or cardboard.  DUF #32.  A sax, or sword was not allowed.  Id.

8         An outdoor religious ground for use by inmates who practiced earth-based

9  religions, like Wicca or Odinism/Asatruism, was provided on Facility C.  DUF #34.  The ground

10 was surrounded by a four-foot fence and consisted of a "Ring of Mystery," surrounded by

11 runestones, a fire pit, in which fires were not allowed; a locked storage locker, and ancestral

12 mound, surrounded by dedication stones, an altar, called a harrow; a sacred "Land Wight"

13 offering area; a water source; and two tree stumps for seating.  Id.

14        Plaintiff and other Odinist inmates held a Midsummer blot on June 20, 2008, in

15 the Facility C chapel at which they were burning candles.  DUF #37.  Plaintiff states that

16 Protestant Chaplain Barham told them that they could not do it in the chapel because it was

17 against the fire code.  DUF #37.  Under the fire code, candles could not be lit in prison buildings,

18 except for a religious service, and then only under the direct supervision of prison and only if a

19 determination had been made that it could be done safely.  Id.  Odinist services now hold their

20 services on the outdoor religious ground where they are allowed to light candles in a fire pit.  Id.

21 Plaintiff states he should not need approval to burn the candles in the chapel because fire was a

22 part of an Odinist blot, and they could not have a blot without lighting a "sacred flame."  Id.

23        On March 3, 2009, defendant, Associate Warden  Lackner notified Odinist

24 inmates on all facilities at MCSP that the RRC had considered and denied the request for

25 approval to burn wood in a fire pit on the outdoor religious ground.  DUF #40.  Earth-based

26 religions are not allowed to burn wood in fire pits on the outdoor religious ground at Mule Creek

1  State Prison.  DUF #41.  Among those groups are Odinist, Wiccans, and Toltecs of the New

2  Millenium.  Id.  The exception are Native Americans who, under staff supervision, are allowed to

3  burn firewood to heat rocks for use in their sweat-lodge ceremony.  Id.  The Native American fire

4  is allowed under staff supervision because it is necessary so that they can have the sweat

5  ceremony, which is the central ritual of their religion.  Id.  The fire is not symbolic.  Id.

6          Defendant Associate Warden Lackner sent plaintiff a letter, dated May 18, 2009,

7  in response to his complaint that an "Out of Bounds" sign had not stopped inmates from jumping

8  the fence on the earth-based religious ground to retrieve stray handballs from a nearby handball

9  court.  DUF # 44.  Plaintiff had asked that the prison build a higher fence.  Id.  Lackner

10  responded that an investigation found that most of the fence jumping occurred during the evening

11  exercise yard.  Id.  Religious activities are not held on the outdoor religious ground in the

12  evening.  Id.  Lackner advised plaintiff that a Facility C lieutenant would talk to the inmates

13  playing handball about the issue and that a memorandum would be sent to Facility C inmates

14  reminding them that they were subject to disciplinary action if caught or seen in an "Out of

15  Bounds" area.  Id.

16          A request by Odinist inmates for approval of personal mead drinking horns was

17  denied at the Associate Warden's Monthly Chaplain/Religious Review Meeting on May 19,

18  2009.  DUF #45.  Drinking horns are made of bone and have a sharp tip.  Id.  Defendants believe

19  that they can be used as weapons and, therefore, personal ones were not allowed for safety and

20  security reasons.  Id.  Odinist inmates are allowed use of a congregate mead drinking horn that

21  has a rounded tip at their group services.  Id.  The use of mead (a mixture of water, honey, and

22  fruit juice) in paper cups was approved by the RRC on March 18, 2009.  Id.  Plaintiff stated that a

23  personal mead cup was acceptable and did not have to be a horn.  Doc. 81, Exh B: Plaintiff's

24  Deposition at 40.

25          On June 17, 2009, defendant Associate Warden Lackner advised staff and inmates

26  of a revised schedule for use of the facility chapels and outdoor religious grounds.  DUF #47.

1   The memorandum stated that all earth-based religious activities would take place on the religious

2   grounds, rather than in the chapel or classrooms, and that the schedule provided that all religious

3   activities in the chapels and on religious grounds were to conclude by 3:30 p.m. each day.  Id.

4   Any activities in the chapel or classrooms after that time would require staff or volunteer

5   supervision.  Id.

6         Plaintiff submitted an inmate appeal, dated August 28, 2009, stating that Muslim

7   inmates had been allowed to attend Ramadan services in the evening in the chapel without staff

8   or sponsor supervision or gun coverage.  DUF # 47.   The Ramadan fast begins at sunrise and

9   does not end until sunset.  Id.  Muslim inmates were allowed to go to the chapel, where they

10  broke their daily fast, under staff supervision.  Id.  The policies changed and Muslim inmates

11  now break their daily fast during Ramadan in the dayrooms of the buildings where they are

12  housed.  Id.  Plaintiff states he was not allowed to have a "special" service on the Odinist outdoor

13  grounds on September 22, 2009, because Warden Martel and Captain Kaplan did not respond to

14  a request for approval until the time for the event had passed.  DUF #48.  Requests for special

15  religious services had to be made 30 days in advance and provide the time, date, location, the

16  chaplain who would be present, and a roster of inmates who would attend.  Id.  Plaintiff does not

17  allege facts showing that he requested approval of this blot sufficiently in advance to obtain

18  approval, or that he provided the required information.  Id.

19        In a memorandum, typed on State of California letterhead, dated January 6, 2010,

20  plaintiff asked the RRC for approval to "manufacture (as a hobby)" a banner for his kindred.

21  DUF #49.  The memorandum stated that his Odinist kindred wanted to make a kindred banner in

22  hobby craft that had an Odin's Cross with his kindred's name on a white handkerchief purchased

23  by the kindred.  Id.  A copy of the drawing was attached to the memo.  Id.  Plaintiff said the

24  banner would be used to drape over the altar at Odinist services.  Id.  The RRC denied the request

25  to have a kindred banner with the Odin's Cross, but stated plaintiff could use a white

26  handkerchief as a kindred banner.  Doc. 81, Exh. C, Attachment 14.  In fact, plaintiff and his

1   kindred has already made the banner, which officers had confiscated and the kindred-banner

2   request was denied by the RRC on March 16, 2010.  Id.  It is unclear if the banner that was

3   confiscated contained an Odin's Cross as was intended, or other symbols such as the Thor's

4   Hammer.

5          Without waiting for a decision by the RRC, and in spite of the denial of his

6   personal drinking horn request in 2009, plaintiff made the kindred banner and a personal drinking

7   horn in hobby craft and then objected when officers confiscated them on February 8 and 10,

8   2010.  DUF #52.  Plaintiff submitted a letter, dated March 8, 2010, to the RRC that complained

9   that staff had confiscated personal drinking horns and altar cloths that Odinist inmates had made.

10  DUF #57.  Requests for approval of personal drinking horns and the Odinist altar cloth and

11  kindred banner with the Odin's Cross had been previously denied.  Id.

12         In February 2010, plaintiff sent a document to an associate warden that contained

13  a printed letterhead.  DUF #65.  Inmates are not allowed to use printed letterheads for personal

14  use.  Id.  Plaintiff had also sent a memo concerning religious issues that appeared to have been

15  composed on a computer.  Id.  Prison policies prohibit inmates from using State equipment for

16  personal matters.  The computer that plaintiff uses for his work assignments was searched and

17  plaintiff was charged with a serious rules violation and removed from that work assignment.  Id.

18  The charge was reduced to an administrative counseling chrono because the law librarian had

19  given plaintiff permission to practice using the computer to familiarize himself with the system

20  and one of the letters was part of the practice.  Id.  However, it was still recommended that

21  plaintiff be removed from the position for using the State computer and materials for his personal

22  use.  Id.

23         Plaintiff submitted an inmate appeal on February 20, 2010, regarding the plan to

24  eliminate the "separate" Odinist area on the earth-based religious ground, which would force

25  them to "integrate" and use the same area as inmates of "conflicting religious faiths," like the

26  Wiccans.  DUF #53.  Plaintiff requested that Odinist inmates be allowed three two-hour time

slots a week in the facility chapel and access to the sanctuary there once a week.  Id.  The chapel

was used by inmates of many faiths, such as Catholics, Protestants, Latter Day Saints, Jehovah's

Witnesses, Jews, Messianic Israelites, Mormons, Muslims, and Buddhists.  Id.  The available

time  slots, when those groups could use the chapel and adequate supervision was available, was

necessarily limited.  Id.  And none of the religious groups, which used the chapel, were also

allowed additional time to use the earth-based religious ground for their religious activities.  Id.

Defendant Associate Warden Jackson interviewed plaintiff two days later and

noted that revisions to the Native American and earth-based religion grounds had begun to create

two grounds similar in size, and that each earth-based religion would be given access to their new

grounds twice a week, once for a primary service and once for a secondary one.  DUF #54.

Jackson told plaintiff that there was enough space on the new ground to accommodate two

circles, and that the revised ground, with two circles, on Facility B was being used by Wiccans,

Asatru/Odinists, and Druids.  Id.  Jackson denied plaintiff's request to keep a separate Odinist

ground on Facility C and to have time slots in the chapel.  Id.  Warden Martel denied the appeal

at the second level, noting that there was enough space on the new grounds to conduct Odinist

services twice a week, that two circles 10 feet in diameter at opposite ends of the area were

provided to accommodate any conflicting beliefs; that each circle had seats for four participants

who could not stand for long periods of time; and that there was a common fire pit where

participants could place candles.  Id.

When prison officials at Mule Creek State Prison began receiving an increasing

number of requests from inmates for separate outdoor worship areas, they began looking into

establishing a non-denominational outdoor religious activity area on each facility, rather than

separate outdoor areas for each religion.  DUF #55.  Prison officials were also concerned about

the potential for violence, if particular areas of the facility yard were sanctioned for a particular

group and became a kind of "turf" for the group.  DUF #56.  Warden Martel decided to close the

existing earth-based religious activity area and to instead maintain the Native American spiritual

grounds, and establish a new non-denominational outdoor religious activity area for use by all other religions who needed an outdoor area and to establish a schedule for use of that area by the different groups.  Id.

Plaintiff filed an inmate appeal, on March 12, 2010, again regarding the closing of the Odinist grounds, and the requirement that Odinist inmates share the new earth-based religious ground with inmates of other religious faiths.  DUF #58.  The appeal was denied.  The new outdoor grounds was built for Facility C next to the Native American Spiritual grounds.  DUF #59.  Both grounds were approximately 1,600 sq. feet in size.  Id.  The earth-based ground was large enough to accommodate two circles with altars and seating, one circle for religions that banished spirits, like the Wiccans, and one circle for religions that invited spirits into the circle, like Odinists, along with a common fire pit.  Id.  A tree stump was provided for an altar with four tree stumps for seating, and a small fire pit where candles could be burned.  DUF #60.

When the new common outdoor area was built in 2010, the part of the Facility C exercise yard formerly used by Odinist inmates for religious activities was closed and returned to its former condition.  DUF #61.  Alterations made to that area by Odinist inmates were removed.  Id.  Plaintiff refused to use the new shared area because it was desecrated and would bring bad luck.  DUF #63.

Relevant Disputed Facts

Defendants state that although not specifically racist, the Odin's Cross, that plaintiff wanted on the kindred banner, is often used by the White power movement, especially Skinheads, and some forms of it contain Celtic knot work of the kind proposed by plaintiff.  DUF #50.[2]

---

[2] It is undisputed that the Odinist religious activities occurred on the earth-based religious ground, which is located on the Facility C yard and can be seen by other inmates who used the yard.  DUF #50.  Those inmates are of different races.  Id.  Because Facility C was a Sensitive Needs Yard, many of those inmates were gang dropouts, or were there because of safety concerns based on race.  Id.  The Odinist inmates were White.  Id.  For safety and security reasons, the institution did not allow symbols that could be viewed by other inmates as White power, Nazi, or

1       Plaintiff contends that Odinists are not responsible for what other people do with

2   their sacred symbols, just like Christians are not responsible for the Ku Klux Klan burning a

3   cross on someone's yard.  DUF #51.   Plaintiff states the symbols he wanted to display were not

4   racist, and he is not responsible for how other people view the symbol.[2]  Id.

5   Analysis[3]

6       Injunctive Relief

7       Plaintiff seeks injunctive relief regarding his claims at MCSP.  However, it is

8   undisputed that plaintiff is no longer incarcerated at MCSP.  Therefore, plaintiff's claims for

9   injunctive relief are moot as he has not provided any evidence that he may be transferred back to

10  that facility.[4]  See Johnson  v. Moore,  948 F.2d 517, 519 (9th Cir. 1991) (per curiam) (transfer to

11  another prison by prisoner challenging conditions of confinement renders moot any request for

12  injunctive relief absent evidence of reasonable expectation that prisoner will be transferred back).

13      Moreover, with respect to defendants Baptista and Barham, plaintiff only seeks

14  injunctive relief against them.[5]  See Doc. 77, Exh. D at 9.  Plaintiff also states in his opposition to

15  _____

16  Skinhead display marking a part of the yard that could be construed as that groups "turf."  Id.

17      [2] Defendants have provided a declaration from the Community Partnership Manager who
    has responsibility for inmate religious programming and stated that the Odin's Cross is used by
18  the White power movement.  Attached to that declaration is a printout from two websites
    including the Anti-Defamation League that specifically discusses how the Odin's Cross is used
19  by White Supremacists.  While the information is compelling if accepted as true, the undersigned
    finds that the declaration is insufficient to be viewed as an expert opinion or for the undersigned
20  to take judicial notice that the Odin's Cross is a hate symbol.

21      [3] Plaintiff has abandoned his claims that defendants did not provide Odinists with state
    funds to purchase religious artifacts, Odinists grounds were not an equal size to Native American
22  grounds, defendants did not provide a spiritual advisor and defendants did not provide banquets
    for special religious services.  Plaintiff has also abandoned his claims against defendant Grannis.
23  Therefore, summary judgment is granted for this defendant and these claims.

24      [4] Plaintiff also filed a separate motion for injunctive relief stating he was transferred as
    retaliation and to make many of his claims moot.  The motion was denied on October 17, 2011,
25  and regardless, plaintiff withdrew the motion.  Doc. 64.

26      [5] Barham was a Protestant Chaplain on MCSP and is now retired and Baptista is still the
    Catholic Chaplain at MCSP.

1    the motion for summary judgment that Baptista and Barham may be released from the complaint.

2    Opposition at 17.  Therefore, summary judgment should be granted for these defendants.

3            RLUIPA

4            The Religious Land Use and Institutionalized Persons Act of 2000 provides in

5    part:

6            No government shall impose a substantial burden on the religious exercise of a
             person residing in or confined to an institution . . . even if the burden results from
7            a rule of general applicability, unless the government demonstrates that imposition
             of the burden on that person-

8            (1) is in furtherance of a compelling government interest; and
9            (2) is the least restrictive means of furthering that compelling government interest.

10   42 U.S.C. § 2000cc-1.

11           As discussed above, plaintiff's claims for injunctive relief are moot, therefore the

12   sole issue for plaintiff's claims under RLUIPA concern monetary damages from defendants in

13   their individual and official capacities.  However, monetary damages are not recoverable under

14   RLUIPA.

15           Individual Capacity

16           RLUIPA creates a cause of action for suits against "a government," which is

17   defined, in pertinent part, as a "State, county, municipality, or other governmental entity," and

18   "branch, department, agency, instrumentality, *or official* of an entity listed in [the previous

19   clause]," and "*any other person* acting under color of state law."  42 U.S.C. § 2000cc-5(4)

20   (emphasis added).  Despite this language, several Circuit Courts have held that RLUIPA does not

21   create a cause of action for damages against officials in their individual capacity.  See Rendelman

22   v. Rouse, 569 F.3d 182, 187-89 (4th Cir. 2009); Nelson v. Miller, 570 F.3d 868, 886-89 (7th Cir.

23   2009); Sossamon v. Lone Star State of Texas, 560 F.3d 316, 327-29 (5th Cir. 2009); Smith v.

24   Allen, 502 F.3d 1255, 1271-75 (11th Cir. 2007).  These Circuits concluded that Congress enacted

25   RLUIPA pursuant to the Spending Clause and did not indicate with sufficient clarity an intent to

26   condition the states' receipt of federal funds on the creation of an individual capacity action for

1   damages; moreover, a contrary reading of the statute would raise serious constitutional concerns

2   about the extent of Congress' authority under the Spending Clause.  See Rendelman, 569 F.3d at

3   187-89; Nelson, 570 F.3d at 887-89; Sossamon, 560 F.3d at 327-29; Smith, 502 F.3d at 1271-75.

4                    The Ninth Circuit has not yet addressed this issue.[6]  Although, the Ninth Circuit

5   has upheld the constitutionality of RLUIPA as an enactment under the Spending Clause, see

6   Mayweathers v. Newland, 314 F.3d 1062, 1066-67 (9th Cir. 2002), the case did not speak to the

7   issue of damages.  Thus, this court adopts the reasoning of the Fourth, Fifth, Seventh, and

8   Eleventh Circuits in the above cases and concludes that plaintiff cannot assert a RLUIPA claim

9   for damages against defendants in their individual capacities.  See Rupe v. Cate, 688 F.Supp.2d

10  1035, 1044-45  (E.D. Cal., February 1, 2010); Harris v. Schriro, 652 F.Supp.2d 1024, 1028-30

11  (D. Ariz., Aug.11, 2009) (dismissing individual capacity claims for damages under RLUIPA

12  based on out-of-circuit authority); Pogue v. Woodford, 2009 WL 2777768, *9 (E.D. Cal., August

13  26, 2009); but see Guru Nanak Sikh Society of Yuba City v. County of Sutter, 326 F. Supp.2d

14  1140, 1162 (E.D. Cal. 2003) (court noted that the recovery of damages under RLUIPA is an open

15  question and only granted plaintiff nominal damages of one dollar against each defendant);

16  Sokolsky v. Voss, 2009 WL 2230871, *5-6 (E.D. Cal., July 24, 2009) (court found on a motion

17  to dismiss that defendants in their individual capacities were not entitled to qualified immunity

18  regarding a Kosher food claim).  Therefore, plaintiff's RLUIPA claims for damages against

19  defendants in their individual capacities should be dismissed.

20                    Official Capacity

21                    The next issue is whether plaintiff can assert a RLUIPA claim for damages against

22  defendants in their official capacities.  "[A] suit against a state official in his or her official

23

24           [6] However, although not addressing the issue, the Ninth Circuit has issued unpublished
     decisions that, by affirming defendants' entitlement to qualified immunity, implicitly assume the
25  existence of an individual capacity RLUIPA claim for damages. See Campbell v. Alameida, 295
     Fed. Appx. 130, 131 (9th Cir. 2008); Von Staich v. Hamlet, 2007 WL 3001726, at *2 (9th Cir.
26  2007).

1    capacity is . . . no different from a suit against the State itself." <u>Will v. Michigan Dep' t of State</u>

2    <u>Police</u>, 491 U.S. 58, 71 (1989).  The Eleventh Amendment prohibits federal jurisdiction over

3    claims against a state unless the state has consented to suit or Congress has abrogated its

4    immunity.  <u>Pennhurst State School & Hosp. v. Halderman</u>, 465 U.S. 89, 99-100 (1984).  The

5    state's consent to suit, however, must be unequivocally expressed.  <u>Id</u>.

6          The Supreme Court has held that the states, and hence also state officials in their

7    official capacity, maintain sovereign immunity from RLUIPA damages actions.  <u>Sossamon v.</u>

8    <u>Texas</u>, __U.S.__, 131 S.Ct. 1651 (2011).  <u>See</u> <u>also</u> <u>Holley v. California Dept. Of Corrections</u>,

9    599 F.3d 1108 (9th Cir. 2010), that the "Eleventh Amendment bars suit for official-capacity

10    damages under RLUIPA."  <u>Id</u>. at 2224.

11          Therefore, plaintiff's monetary claims against defendants in their official

12    capacities are barred by the Eleventh Amendment.

13       <u>First Amendment Free Exercise</u>

14          While inmates retain their First Amendment right to the free exercise of religion, a

15    regulation impinging on an inmate's constitutional rights passes muster so long as it is

16    reasonably related to a legitimate penological interest.  <u>Henderson v. Terhune</u>, 379 F.3d 709, 712

17    (9th Cir. 2004), <u>citing</u> <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348, 107 S.Ct. 2400 (1987)

18    and <u>Turner v. Safley</u>, 482 U.S. 78, 89, 107 S.Ct. 2254 (1987).  The protections of the Free

19    Exercise Clause are triggered when prison officials substantially burden the practice of an

20    inmate's religion by preventing him from engaging in conduct which he sincerely believes is

21    consistent with his faith.  <u>Shakur v. Schriro</u>, 514 F.3d 878, 884–85 (9th Cir. 2008).

22          The <u>Turner</u> test includes four factors to determine if a prison regulation violates a

23    prisoner's constitutional rights.  "First, there must be a valid, rational connection between the

24    prison regulation and the legitimate governmental interest put forward to justify it, and the

25    governmental objective itself must be a legitimate and neutral one.  A second consideration is

26    whether alternative means of exercising the right on which the regulation impinges remains open

to prison inmates.  A third consideration is the impact accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources.  Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation."  Allen v. Toombs, 827 F.2d 563, 567 (9th Cir. 1987) (citing Turner, 482 U.S. at 89-91).

Important to the instant case, prison authorities are not responsible for duplicating every religious benefit provided to other religions so that all religions are treated exactly the same.  As the Supreme Court stated in Cruz v. Beto, 405 U.S. 319, 322, n.2, 92 S.Ct. 1079 (1972):

> We do not suggest . . . that every religious sect or group within a prison-however few in number-must have identical facilities or personnel.  A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand.  But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty.

Application of the standard set forth in Cruz does not require "strict numerical analysis" or "create a system of ratios or quotas."  Thompson v. Commonwealth of Ky., 712 F.2d 1078, 1081 (6th Cir. 1983) (upholding grant of summary judgment on Muslim inmates' request for access to chapel comparable to Christian inmates).

After reviewing the extensive records in this case it is clear that prison officials have spent great time, effort and expense to provide inmates the ability and freedom to practice whatever religion they so choose as protected by the First Amendment and other laws. Defendants motion for summary judgment, docket entry 81, exhibit C, part 1, contains exhaustive rules and regulations examining religious worship and the items vital to each religion, those are allowed, and those that are not permitted both for individuals and for a congregation. This extensive list combined with undisputed facts of this case reveal the amount of freedom that plaintiff had been provided to practice Odinism.  This is not a case where plaintiff's ability to pursue his religious beliefs has been hampered by defendants, rather defendants must make common sense decisions to maintain peace and order among the entire prison that houses so

many religions with such a wide array of beliefs, and inmates envious of benefits afforded to other religions.  As discussed below, plaintiff focuses on benefits and privileges that other groups were provided, and not on how the ability to practice Odinism was curtailed.  Nevertheless, the undersigned will look to plaintiff's specific claims.  The instant action raises the following First Amendment Free Exercise of religion claims:

- Plaintiff was not allowed to buy a religious item
- Plaintiff and the Odinists missed one ceremony
- Stray handballs from a nearby handball court occasionally came on the Odinist outdoor space
- Odinists were provided tree stumps to sit on in their outdoor space while the indoor chapel contained benches and a blackboard and the Native American outside space contained benches
- Plaintiff was denied inside classroom space
- Night services were discontinued
- Lack of personal mead horns
- Only candles were allowed in the fire pit
- Prohibition of Odin's Cross
- Denial of altar cloths
- The original Odinist space was destroyed and Odinists were forced to share a new outdoor space with other religions

<u>Ceremony & Religious Item</u>

It is first alleged that one ceremony was not permitted and plaintiff was unable to buy a religious item from an approved vendor.  With respect to the ceremony it is undisputed that plaintiff was allowed to attend all other ceremonies and the missed ceremony was an isolated incident.  It is also not clear if plaintiff requested the ceremony to occur with enough time to allow defendants to properly plan it.  With respect to plaintiff's claim regarding purchasing religious items, plaintiff was only prevented on one or two occasions from purchasing items, but

1  plaintiff's own exhibits indicate that plaintiff on all other occasions was able to buy items.

2  Opposition, Exh. MM.  Moreover, it is undisputed that plaintiff personally possesses many

3  Odinist items.  The one missed ceremony and the once or twice denial of religious items fails to

4  show a substantial burden on plaintiff's religious exercise, especially in light of everything else

5  plaintiff was allowed.  See Canell v. Lightner, 143 F.3d 1210, 1215 (9th Cir. 1998).

6                     Handballs, Religious Spaces, Benches & Night Programs

7                     With respect to the handballs, Odinist religious space compared to other spaces

8  and classroom space, plaintiff has failed to show any type of burden upon his religious practices.

9  It is undisputed that a fence was in place to prevent handballs from hitting the Odinist grounds,

10  rather plaintiff wanted the fence built higher.  It is also undisputed that this occurred most often

11  at night when there were no religious services.  While this may be a nuisance, it is not a violation

12  of the First Amendment.

13                     Plaintiff also claims a First Amendment violation in the restriction on outdoor and

14  indoor space, in that a religious group was entitled to either an indoor space or an outdoor space

15  not both.  Based on plaintiff's pleadings it is clear that an outdoor religious space is a sincerely

16  held belief consistent with plaintiff's faith, which has been provided by defendants.  While

17  plaintiff is upset that he does not have access to the inside chapel as well, there is no evidence

18  that plaintiff requires the chapel for the religion, rather he is upset that other faiths are able to use

19  it.  While plaintiff states an indoor weather safe area would be beneficial to studying books and

20  runes, it is not clear why he cannot accomplish this in his cell during bad weather or outside on

21  the religious grounds at other times.  Nor does plaintiff state why a blackboard is required for his

22  religion.  This claim fails due to the lack of any burden on plaintiff's ability to practice his

23  religion.

24                     Other then wanting benches instead of tree stumps, plaintiff has failed to allege

25  facts to show how the Native American's possession of benches affects plaintiff as an Odinist.  It

26  is undisputed that night services were prohibited for everyone unless permission was provided.

Plaintiff does not allege that night services were required for Odinists, rather plaintiff notes that Muslims were allowed night services for Ramadan.  This does not state a constitutional violation.  As stated above in <u>Cruz</u>, prison authorities are not responsible for duplicating every religious benefit provided to other religions so that all religions are treated exactly the same.  <u>Id</u>., at 322, n.2.

### Personal Mead Horn

Plaintiff's claim regarding a personal mead horn are similarly flawed.  It is undisputed that a drinking horn made of bone with a sharp time was denied by defendants due to the potential use as a weapon.  It is also undisputed that Odinist inmates are allowed use of a congregate mead drinking horn that has a rounded tip and paper cups are provided on other occasions to drink mead.  Plaintiff also stated in his deposition that a cup could suffice as a personal mead horn.  In this case, defendants have a valid interest in keeping out objects made of bone with a sharp point and have found an alternative means by providing a safer drinking horn and other cups.

### Candles in the Fire Pit

Plaintiff states that fire is a central tenet of Odinism and a sacred fire acts as a symbolic flame of their faith.  Candles are insufficient as it is a bad omen if a candle blows out.  The Odinist grounds have a fire pit, but it is made of cement and stone and burning wood is not allowed.  Plaintiff alleges that defendants are modifying the faith only providing candles and not allowing larger wood burning fires.  Plaintiff also notes that Native American's are allowed to use wood fires to heat stones for sweat lodge rituals.

Ultimately, plaintiff has failed to show how burning candles burdens the ability to practice his religion.  Rather, he states wood is needed, without explaining why, and focuses on the issue that Native American's are allowed to use wood.  Defendants note that the sweat lodge ceremony is both a central ritual of their religion and sincerely held belief, while the fire is only symbolic to Odinists, which matches plaintiff's own statements.  While not specifically alleged

by defendants, the undersigned assumes that large open fires inside the prison could also

potentially pose a danger to other inmates and prison officials.  As plaintiff has failed to set forth

reasons why a wood fire is required and candles burden his ability to practice Odinism, this claim

should be denied.

Prohibition of Odin's Cross

Plaintiff next argues that the prohibition of the Odin's Cross violates the free

exercise of his religion.  It is a disputed fact whether the Odin's Cross is a racist symbol.

Though, it is undisputed that defendants were concerned that other races could be offended and

there could perhaps be violence if the symbol was displayed.  It is also undisputed that the

Odinists are White and plaintiff has numerous tattoos on his body including swastikas, a Thor's

Hammer, the words "Aryan Loyalty" and "White Power."

Assuming for purposes of this motion that the Odin's Cross is not a racist symbol,

plaintiff still fails to set forth a viable First Amendment claim.  Plaintiff's arguments focus on

how it was unfair that the Odin's Cross was banned, yet plaintiff fails to discuss the importance

of the symbol and how the prohibition of the symbol burdened his ability to practice Odinism.

Plaintiff simply states that the Odin's Cross is one of many sacred symbols, yet it is undisputed

that plaintiff and Odinists were allowed to use other symbols in their worship such as Thor's

Hammer and other runes.  As there is no indication that plaintiff has been substantially burdened

in the ability to practice his religion, this claim should be denied.

Altar Cloths

It is undisputed that plaintiff was allowed to have an altar cloth, but it needed to

be approved by the RRC.  It is undisputed that plaintiff requested an altar cloth that contained an

Odin's Cross and that request was denied.  It is undisputed that despite the request being denied,

plaintiff made an altar cloth, without approval, that was eventually confiscated.  It is disputed if

the altar cloth that was confiscated contained an Odin's Cross or different symbols.  Assuming

that the altar cloth did not contain an Odin's Cross, plaintiff has failed to set forth a viable claim

21

for a First Amendment violation.  Defendants have a legitimate interest in requiring approval of altar cloths to, for example, avoid the use of inflammatory symbols.  Plaintiff's request was denied but he created an altar cloth anyway without approval.  Plaintiff has failed to show how the confiscation of the altar cloth burdened his religious practice or how allowing plaintiff to use a white handkerchief as an altar cloth is unacceptable.  This claim should be denied.

<u>Sharing of Odinist Grounds</u>

Essentially, plaintiff desires a separate religious outdoor space strictly for his Odinist group that cannot be used by other inmates or religions or even another Odinist group. As defendants note, plaintiff has not cited any case authority that states prison officials must provide specific spaces for every religious group and ban other groups from using them.  It seems that prison officials at MCSP were gracious enough to first provide such a space for plaintiff and the Odinists.[7]  However, it seems other inmates and groups were envious that Odinists were provided their own outdoor space, so other inmates requested separate outdoor spaces.  It is not a violation of the First Amendment that defendants took away the original Odinist space and then provided a new non-denomination outdoor space.  Just as the prison has a chapel shared by many faiths it is common sense to have an outdoor space shared by many faiths.  Prison officials cannot be responsible for building a different house of worship for every faith in the facility or provide a different unique outdoor space for the groups that desired them.  Defendants were also correctly worried that different groups each possessing a different area of the yard, that was officially sanctioned by the prison, where other groups were not allowed would lead to an untenable and possibly dangerous situation.  Moreover, other than not wanting to have to share a religious space, plaintiff has failed to articulate a sufficient argument on how sharing an outdoor space burdens his ability to practice his religion.  This claim should be denied.

---

[7] Contrary to plaintiff's assertion, that prison officials first provided an outdoor space for Odinists and then closed it, does not provide plaintiff a liberty interest in that particular area of the prison yard.

1        Fourteenth Amendment Equal Protection

2            "The Equal Protection Clause of the Fourteenth Amendment commands that no

3    State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

4    essentially a direction that all persons similarly situated should be treated alike."  City of

5    Cleburne v. Cleburne Living Center, 473 U.S. 432, 440-41,105 S.Ct. 3249 (1985), quoting Plyler

6    v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382 (1982).

> The guarantee of equal protection is not a source of substantive
> rights or liberties, but rather "a right to be free from discrimination
> in statutory classifications and other governmental activity."
> Williams v. Vidmar, 367 F.Supp.2d 1265, 1270 (N.D.Cal. 2005).
> "[D]iscrimination cannot exist in a vacuum; it can only be found in
> the unequal treatment of people in similar circumstances."
> Freeman v. City of Santa Ana, 68 F.3d 1180, 1187 (9th Cir.1995).

11   California Parents for Equalization of Educational Materials v. Noonan, 600 F.Supp.2d 1088,

12   1110-11 (E.D. Cal. 2009).

13           "The Equal Protection Clause entitles each prisoner to 'a reasonable opportunity

14   of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to

15   conventional religious precepts.'"  Shakur v. Schriro, 514 F.3d 878, 891 (9th Cir. 2008) (quoting

16   Cruz v. Beto, 405 U.S. 319, 322, 92 S.Ct. 1079 (1972)).  The Turner test described above applies

17   also to Equal Protection claims arising out of prison.  Shakur, 514 F.3d at 891.

18           "To state a § 1983 claim for violation of the Equal Protection Clause, a plaintiff

19   must show that he was treated in a manner inconsistent with others similarly situated, and that

20   the defendants acted with an intent or purpose to discriminate against the plaintiff based upon

21   membership in a protected class."  Thornton v. City of St. Helens, 425 F.3d 1158, 1166-67 (9th

22   Cir. 2005).

23           Liberally construing this action, plaintiff alleges an Equal Protection violation in

24   that Muslims were allowed night services when Odinists were not, Native Americans were

25   allowed to burn wood fire while Odinists were only allowed to burn candles, Native Americans

26   were allowed to display their symbol, a sun wheel, while Odinists were not allowed to display

1   Odin's Cross in the same manner, and Native Americans had benches on their grounds while

2   Odinists only had tree stumps.[8]

3   Yet, these claims fail to state a violation because in most of these instances,

4   Odinists were not similarly situated to the other religious groups.  It is undisputed that Muslims

5   were allowed night services as it was Ramadan which provides for a fast that begins at sunrise

6   and does not end until sunset.  Muslim inmates were allowed to go to the chapel at night, where

7   they broke their daily fast, under staff supervision.  Plaintiff was not similarly situated with

8   Muslims and the tenants of Ramadan to state a claim nor has plaintiff shown an intent to

9   discriminate.  Moreover, Muslim inmates now break their daily fast during Ramadan in the

10  dayrooms of the buildings where they are housed, so any claim is moot as they are no longer

11  using the chapel.

12  With respect to the burning of wood, plaintiff has failed to show any

13  discrimination.  Native Americans are allowed to use wood to warm stones for a sweat lodge

14  ceremony, while Odinists can only use candles when they require fire.  The relationship between

15  fire and the respective religions is different so the two groups are not similarly situated.

16  Ultimately, plaintiff has failed to show that candles are somehow inferior to a wood fire with

17  respect to the requirements of Odinism or that defendants acted in a discriminatory manner.

18  As discussed above, Odinists were not allowed to use the Odins's Cross symbol

19  on a banner.  That Native Americans were allowed to use their own entirely different symbol

20  fails to state an Equal Protection violation.  Nor has plaintiff demonstrated that Native

21  American's use of benches was intentionally discriminatory on the behalf of defendants against

22  plaintiff based on his status as an Odinist.  It is also undisputed that the Odinist grounds were

23  provided with tree stumps to sit on a part of their outdoor grounds.  Summary judgment should

24

25  [8] Plaintiff also states that Odinists were not allowed an outdoor religious ground and
    access to the chapel.  However, as it is undisputed that all religions faced this same restriction,
26  there is no Equal Protection claim.

1    be granted as to all of these claims.

2         Retaliation

3              The Ninth Circuit treats the right to file a prison grievance as a constitutionally

4    protected First Amendment right.  Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009), citing

5    Rhodes v. Robinson, 408 F.3d 559, 566 (9th Cir. 2005); Bruce v. Ylst, 351 F.3d 1283, 1288 (9th

6    Cir. 2003).  To state a viable claim for retaliation in violation of the First Amendment in the

7    prison context, a plaintiff must show five basic elements: "(1) An assertion that a state actor took

8    some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and

9    that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the

10   action did not reasonably advance a legitimate correctional goal."  Brodheim, 584 F.3d at 1269

11   (quoting Rhodes, 408 F.3d at 567–68).   Mere conclusions of hypothetical retaliation will not

12   suffice, a prisoner must "allege specific facts showing retaliation because of the exercise of the

13   prisoner's constitutional rights."  Frazier v. Dubois, 922 F.2d 560, 562 n.1 (10th Cir. 1990).

14   Adverse action is action that "would chill a person of ordinary firmness" from engaging in the

15   protected activity.  Pinard v. Clatskunie School Dist. 6J, 467 F.3d 755, 770 (9th Cir. 2006).

16   Plaintiff need not show that "'his speech was actually inhibited or suppressed,' but rather that the

17   adverse action at issue 'would chill or silence a person of ordinary firmness from future First

18   Amendment activities.'"  Brodheim at 1271.  Plaintiff also bears the burden of pleading and

19   proving the absence of legitimate correctional goals for the conduct of which he complains.  Id.

20              This is not to say that a vexatious grievance filer can never be punished.

21   Vexatious litigants may be the subject of court discipline, and the undersigned would find it

22   incongruous that while the courts can punish vexatious filings, prison officials may not.  Indeed,

23   the right to petition for grievances is not absolutely protected; such a right has no greater

24   protection than speech in general.  Rendish v. City of Tacoma, 123 F.3d 1216 (9th Cir. 1997).  In

25   the prison context, one's free speech rights are more constricted from what they would be on the

26   outside.  O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S. Ct. 2400 (1987).  Again, plaintiff

must show that the actions or omissions constituting the "retaliation" served no legitimate penological goal.

On December 1, 2009, plaintiff filed an inmate appeal against defendant Barroga, after Barroga stated that the Odin's Cross could not be displayed in the open as it was viewed as a hate symbol.  Plaintiff's cell was then searched on December 3, 2009.  Plaintiff does not state who searched his cell or if it was even a defendant in this action.  However, plaintiff is the lead clerk in the prison law library and has access to rubber stamps for legal documents that read: confidential, copy, original, exhibit and other similar words.  According to plaintiff's Exhibit AA, the search was conducted because a "Confidential" rubber stamp was missing from the library and the stamp is used by staff to mark official documents for insertion into various files.  Most importantly, plaintiff stamped the word "Confidential" on his December 1, 2009, appeal.  Plaintiff concludes the search was in retaliation for his complaint against Barroga.

On February 10, 2010, plaintiff filed an inmate appeal against Kaplan and Alexander for confiscating religious banners.  Opposition, Exh. BB.  It is undisputed that banners need to be examined and approved prior to use, and these banners had not been approved or examined.[9]  Id.  On February 11, 2010, plaintiff's cell was searched and his drinking horn was confiscated that he had made with hobby craft materials.  Opposition, Exh. CC.  Again plaintiff does not identify who searched his cell.  As previously stated, a request by Odinist inmates for approval of *personal* drinking horns was denied at the Associate Warden's Monthly Chaplain/Religious Review Meeting on May 19, 2009, as drinking horns are made of bone and have a sharp tip.  Id.  Odinist inmates are allowed use of a *congregate* drinking horn that has a rounded tip at their group services.  Moreover, plaintiff's request for a personal drinking horn had been already denied in 2009, and in his deposition plaintiff stated that a normal cup was adequate.  Plaintiff again merely concludes the search and confiscation of the drinking horn was

---

[9] It is disputed if this particular banner contained the Odin's Cross.

retaliation for the inmate appeal.

On February 22, 2010, plaintiff was interviewed regarding the complaint he filed against defendant Kaplan on February 10, 2010, that was discussed above.  On February 24, 2010, plaintiff's cell was searched and 13 legal documents were confiscated.  Opposition, Exh. EE.  Plaintiff states defendant Kaplan ordered the cell to be searched.[10]  Plaintiff does not describe what the legal documents consisted of, however these were the documents that contained a printed letterhead from a computer.  Inmates are not allowed to use State equipment, such as computers, for personal matters and plaintiff's job provides him access to computers.  Plaintiff had also recently sent a memo to prison staff concerning religious issues from a computer.  Also on February 24, 2010, defendants searched plaintiff's work computer to locate anything that was personal.  Plaintiff was charged with a disciplinary violation for using the computer for personal use, though it was later reduced to an administrative counseling chrono.  Plaintiff alleges the search and administrative charge were in retaliation for his grievances.

It is clear that there was a somewhat contentious relationship between plaintiff and prison authorities.  Plaintiff was attempting to practice his religion as he deemed fit and prison authorities were attempting to maintain order and fairness between so many prisoners desiring to practice dozens of different religions all with specific needs and requests.  While plaintiff's cell appeared to have been searched many times, plaintiff also appeared to file inmate grievances quite often so it is difficult to presume the cell searches were in retaliation.   In the specific circumstances discussed above that plaintiff alleges was retaliatory, each occasion was advancing a legitimate correctional goal.  The items confiscated had been requested by plaintiff in the past and denied, or the items were prohibited so it is hardly surprising that defendants would eventually confiscate these items.

_____

[10] Non defendant Bradley searched plaintiff's cell on February 24, 2010.  Defendant Kaplan was asked by an associate warden to investigate how plaintiff was able to construct a document with a letterhead.

Attempting to find an official stamp used by the prison library for official correspondences is a legitimate goal and as plaintiff states he is the lead clerk so it was not surprising that his cell was searched, especially as plaintiff used the missing stamp itself on his appeal.  It is undisputed that plaintiff requested to have certain banners and drinking horns, but these requests were denied, so plaintiff was on notice that these items would be confiscated.  It is also reasonable that plaintiff would be investigated for using printed letterheads on State computers for his personal business.  Defendants have a legitimate penological goal in restricting inmates from using State property and resources to pursue personal goals such as inmate appeals and lawsuits all against the State itself, especially when the inmate is using the resources while at a prison job.[11]  While it is possible that all the searches or filing of charges were retaliatory, it is clear there were legitimate penological goals for the confiscated items and disciplinary charges.

Plaintiff has also failed to demonstrate that the searches themselves which occurred after he filed grievances were necessarily linked to the filings, especially when he files so many grievances, as illustrated in his own exhibits.[12]  Prisons could not function if every act of prison officials was challenged as retaliatory simply because an inmate files numerous appeals and concludes the two are related.  This case illustrates this type of predicament, as plaintiff filed appeals in response to so many actions taken by defendants.  When defendants took further or future actions, plaintiff accused the defendants of retaliation, based on prior appeals, and plaintiff filed further appeals describing the retaliation.  Plaintiff then assumed the further action by defendants was in retaliation to the appeals describing retaliation, and so on.

\\\\\

---

[11] Nor would it be fair that certain inmates are allowed use of State computers to pursue their claims while other inmates are not allowed to use computers.

[12] Plaintiff also alleges in his opposition that he was transferred to another prison in retaliation for his protected conduct.  Plaintiff raised this in a motion for a preliminary injunction which in addition to being denied (Doc. 73), was also withdrawn by plaintiff (Doc. 64), as he was transferred to a prison that he preferred.  Plaintiff also raised this claim in a separate action, S-11-0685 JAM EFB, that plaintiff voluntarily dismissed.

1    In <u>McCollum v. Cal. Dept. of Corrections & Rehabilitation</u>, 647 F.3d 870, 882

2   (9th Cir. 2011), the Ninth Circuit explained that "[t]o raise a triable issue as to motive, [a

3   plaintiff seeking to defeat summary judgment on a retaliation claim] must offer either direct

4   evidence of retaliatory motive or at least one of three general types of circumstantial evidence."

5   (internal quotation marks omitted).  Circumstantial evidence of motive most often includes: (1)

6   proximity in time between the speech and the retaliation; (2) "that the defendant expressed

7   opposition to the speech;" or (3) other evidence calling into doubt the reasons defendants provide

8   for taking the adverse action.  <u>Id</u>.

9    In the instant case, plaintiff only provides general allegations as to retaliatory

10   motive, in that defendants were persecuting plaintiff due to his religion.  Yet, there are seventeen

11   served defendants in this action and plaintiff seems to imply that all defendants were persecuting

12   him.  In his opposition, plaintiff states that defendants threatened him with a prison transfer if he

13   did not lay low, however, plaintiff does not identify the defendant who made the statement,

14   when, or in what context.  Regarding the specific instances of retaliation described above,

15   plaintiff has failed to identify the specific defendants involved or that the defendants opposed

16   plaintiff's protected conduct.  For example, when plaintiff filed an appeal against defendant

17   Barroga, an unknown party or parties searched plaintiff's cell.  Plaintiff concludes Barroga was

18   responsible for orchestrating the search, but does not provide any evidence in support.  While the

19   party that conducted the search may have had retaliatory intent, that party was not Barroga, nor

20   even identified.  Nor has plaintiff presented evidence that Barroga opposed plaintiff's religion.

21    While plaintiff has set forth allegations that demonstrate proximity in time

22   between the conduct and the retaliation, i.e., the searches, as previously discussed the conduct

23   itself involved use of a stamp or printed letterheads so of course defendants would immediately

24   investigate upon receiving plaintiff appeals or letter and defendants had legitimate reasons to

25   investigate.  Yet despite the closeness in time, plaintiff has failed to show that the defendants

26   expressed opposition to his conduct and plaintiff has failed to sufficiently rebut the legitimate

1   reasons for defendants' actions.  As a result, plaintiff's conclusory reasoning fails to overcome

2   defendants motion for summary judgment and the legitimate correctional goals of defendants,

3   therefore summary judgment should be granted.

4           Grievances

5                   As noted above, plaintiff withdrew his claims against defendant Grannis, who is

6   the chief of inmate appeals, though it is not clear from the opposition if plaintiff proceeds with

7   claims against any other defendants with respect to the denial of inmate appeals.  Regardless, any

8   claims involving the denial of inmate appeals should be dismissed.

9                   Firstly, if the claims against the underlying alleged actors do not pass muster,

10  persons engaged in the adjudication of grievances cannot be liable for denying those grievances

11  based on the alleged claims.  Even if this were not the case, the grievance claims are deficient.

12                  The undersigned does not view the grievance claims as assertions that the

13  grevance process per se is defective.  If such were the case prisoners do not have a "separate

14  constitutional entitlement to a specific prison grievance procedure."  Ramirez v. Galaza, 334

15  F.3d 850, 860 (9th Cir. 2003), citing Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988).  Even

16  the nonexistence of, or the failure of prison officials to properly implement, an administrative

17  appeals process within the prison system does not raise constitutional concerns.  Mann v. Adams,

18  855 F.2d at 640.  See also, Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993); Flick v. Alba,

19  932 F.2d 728 (8th Cir. 1991); Azeez v. DeRobertis, 568 F.Supp. 8, 10 (N.D. Ill.1982) ("[A

20  prison] grievance procedure is a procedural right only, it does not confer any substantive right

21  upon the inmates.  Hence, it does not give rise to a protected liberty interest requiring the

22  procedural protections envisioned by the fourteenth amendment").  Specifically, a failure to

23  process a grievance does not state a constitutional violation.  Buckley, supra.[13]

24  \\\\\

25

26          [13] The undersigned will not look to the qualified immunity argument as to any of the
    claims as no constitutional violations have been found.

1      Rather the claim is directed to all those in the grievance process business as

2    assertions that they have somehow ratified and caused the alleged deficient policies and actions.

3    The undersigned is unwilling to adopt a rule that anyone involved in adjudicating grievances

4    after the fact is per se potentially liable under a ratification theory.  Defendants sued in their

5    individual capacity must be alleged to have: personally participated in the alleged deprivation of

6    constitutional rights; known of the violations and failed to act to prevent them; or implemented a

7    policy that repudiates constitutional rights and was the moving force behind the alleged

8    violations. Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991); Hansen v. Black,

9    885 F.2d 642 (9th Cir. 1989); Taylor v. List, 880 F.2d 1040 (9th Cir. 1989).  "Although a § 1983

10   claim has been described as 'a species of tort liability,' Imbler v. Pachtman, 424 U.S. 409, 417,

11   96 S. Ct. 984, it is perfectly clear that not every injury in which a state official has played some

12   part is actionable under that statute."  Martinez v. State of California, 444 U.S. 277, 285, 100 S.

13   Ct. 553 (1980).  "Without proximate cause, there is no § 1983 liability."  Van Ort v. Estate of

14   Stanewich, 92 F.3d 831, 837 (9th Cir. 1996).

15           The search, which was performed in accordance with this constitutionally valid
             strip search policy, was subsequently ratified by the School Board when Mr.
16           Williams filed a grievance.  Therefore, Williams' only grasp at evoking municipal
             liability under § 1983 is to show that this subsequent ratification is sufficient to
17           establish the necessary causation requirements.  Based on the facts, the Board
             believed Ellington and his colleagues were justified in conducting the search of
18           Williams.  There was no history that the policy had been repeatedly or even
             sporadically misapplied by school board officials in the past.  Consequently, the
19           School Board cannot be held liable for the ratification of the search in question,
             because this single, isolated decision can hardly constitute the "moving force"
20           behind the alleged constitutional deprivation.

21   Williams v. Ellington, 936 F.2d 881, 884-885 (9th Cir. 1991).

22           However, this is not to say that persons involved in adjudicating administrative

23   disputes, or persons to whom complaints are sometimes made can never be liable under a

24   ratification theory.  If, for example, a reviewing official's rejections of administrative grievances

25   can be construed as an automatic whitewash, which may have led other prison officials to have

26   no concern of ever being reprimanded, a ratifying official may be liable for having put a defective

1   policy in place.  Yet in reviewing this case, it is clear that plaintiff has been provided great

2   latitude in the ability to practice his religion and there is no indication of any automatic denial of

3   appeals from the defendants.  For example, plaintiff was provided an outdoor space to practice

4   his religion, but states that balls from a nearby handball court bounce away and disturb the

5   religious space.  A fence was already in place but plaintiff alleges the fence is not tall enough and

6   defendants' refusal to build a taller fence is violating his constitutional rights.  Denial of this

7   grievance does not demonstrate an automatic whitewash by defendants.

8          Defendant Petersen

9          Service was effectuated on all defendants except Petersen.  On April 29, 2011,

10  plaintiff was provided additional service forms and instructed to return the service forms to the

11  court within sixty days so the United States Marshal could serve Petersen.  The sixty day period

12  expired and plaintiff did not return the service forms or otherwise communicate with the court

13  regarding Petersen, so on August 23, 2011, the undersigned recommended that Petersen be

14  dismissed.  Plaintiff filed objections stating that he sought discovery regarding Petersen, but was

15  unsuccessful and chose not to file a motion to compel, because there was no one to direct the

16  motion to.  Plaintiff failed to state why he never requested aid from the court and never raised

17  this issue until his September 2011 objections, many months after the court's order.  Those

18  findings and recommendations are still pending.

19         "A District Court may properly on its own motion dismiss an action as to

20  defendants who have not moved to dismiss where such defendants are in a position similar to

21  that of moving defendants or where claims against such defendants are integrally related."

22  Silverton v. Dep't. of Treasury, 644 F.2d 1341, 1345 (9th Cir. 1981).  "Such a dismissal may be

23  made without notice where the [plaintiff] cannot possibly win relief."  Omar v. Sea–Land Serv.,

24  Inc., 813 F.2d 986, 991 (9th Cir. 1987).  The court's authority in this regard includes sua sponte

25  dismissal as to defendants who have not been served and defendants who have not yet answered

26  or appeared.  Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery, 44 F.3d 800, 802 (9th Cir.

1   1995) ("We have upheld dismissal with prejudice in favor of a party which had not yet appeared,

2   on the basis of facts presented by other defendants which had appeared."); <u>Ricotta v. California</u>,

3   4 F.Supp.2d 961, 978–79 (S.D. Cal.1998).

4         According to plaintiff, Petersen was a correctional sergeant at MSCP at the

5   relevant times, and is only mentioned twice in the operative first amended complaint.  Doc. 16.

6   Plaintiff stated:

7         Defendants Subia, Martel, Long, Jackson, Lackner, Kaplan, Petersen, were placed
    on notice through appeal, and by their authority refused to provide benches and
8         tables for Odinist religious grounds to accommodate study, while allowing the
    Native Americans and Chapel based groups to have tables and seating.

9   Doc. 16 at 13.

10        Plaintiff also stated:

11

12        Defendants Martel, Long, Jackson, Lackner, Minnick, Peterson, Kaplan, through
    their authority, have obstructed plaintiffs access to religious property; refused to
13        let them mark personal cups to serve the religious purpose; deny religious requests
    on baseless grounds as being unauthorized when items are clearly on the list in the
    DOM; and when plaintiffs create paper mache items to serve the spiritual purpose,
14        the items are confiscated.

15  Doc. 16 at 15.

16        First, it is not clear what actions plaintiff is attributing to Petersen and moreover,

17  plaintiff's claims regarding the denial of benches, personal drinking horns and other religious

18  goods were specifically addressed above and fail to state viable claims.  It would be a waste of

19  scarce resources requiring the United States Marshal to serve defendant, counsel be obtained to

20  answer the complaint, pursue discovery, file a motion for summary judgment nearly identical to

21  the instant motions and the court forced to spend additional time reviewing the identical facts and

22  claims.  As Petersen is in a situation similar to the moving defendants, Petersen should be

23  dismissed from this action for the reasons set forth above.

24        Accordingly, IT IS HEREBY ORDERED that defendants' motion for an

25  extension (Doc. 80) is granted and the motion for summary judgment is deemed timely filed;

26  \\\\\

IT IS HEREBY RECOMMENDED that:

1.  Unserved defendant Petersen should be dismissed from this action; and

2.  Defendants' motions for summary judgment (Docs. 77, 81) be granted in their entirety and this case closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 9, 2012

                            /s/ Gregory G. Hollows
                    UNITED STATES MAGISTRATE JUDGE

GGH: AB
bird0719.sj